Diane Dragon for the defendant, Richard Carrillo. Several issues were raised in the brief in Mr. Carrillo's case, and they all kind of interrelate to each other. I'm going to start with the Brady issue. You can't abide by an obligation that you don't understand, and neither the government or the court understood the Brady obligation in this case. And as a result, significant relevant Brady information was withheld, undermining confidence in the outcome of the trial. The government repeatedly stated prior to trial that Brady didn't encompass impeachment material. That was wrong. The government repeatedly argued they were under no obligation to disclose any information related to a paid government informant. Why isn't it cured? Because eventually the defense found her, and she was put on the stand and cross-examined. Your Honor, it's not cured because she was never cross-examined. She was brought into – She was examined on direct. She was examined, but I would argue that there's a significant difference between direct examination and cross-examination. And regardless of the fact that she was brought into the courtroom, none of this information was disclosed. So I was in a position where although I had the informant sitting on the stand, I had no information with which to cross-examine her. I didn't have informant agreements. I didn't have debriefing reports. You didn't have her deal when you examined her? No. The only information that the government provided, and they provided it a day or two before the trial, was a one-page list that listed payments and dates. They did not provide any correlation of what the payments were for or what the dates, you know, what cases the payments went for, if it included expenses or anything. They provided that one document, and then they also provided one document that she wrote regarding a meeting with my client. They also gave a fax earlier that said, that purported to give me her last name, her last known address, which was later found to be incorrect. And then they said that she was working to get her husband benefits in a case, and he got probation. They didn't give me the husband's name. They didn't give me the case number. They didn't give me the original charges. When I asked about the deal, what I really meant was is I understood it. She was doing this to get a more lenient deal for her husband. That is one of the reasons she was doing it. They did say that that was one of the reasons. Was that disclosed to you? Excuse me? Was that disclosed to you? After I filed my motion, the Court ordered them to disclose information, and they did disclose that the husband got probation. Were you prejudiced by the lateness of the disclosure? I was prejudiced by the lack of disclosure, because although they gave me the case number. So you have to address the lateness under Zuno RC. Well, I agree to some extent that, yes, it was late, but I did get it before trial, that piece. But what I'm arguing is that was just one piece of what she was working for, and the government didn't disclose the rest of it. They didn't disclose that her husband was still in custody in Idaho, and I have no idea what benefits he was getting from her continued cooperation. They didn't disclose that. Well, how would it have improved your defense had you known all the details of how many different deals she was making with the DEA? I don't necessarily know that the exact number of cases would have made the difference. I don't know the nature of them or the details of the minutiae of these deals. How would it affect your defense? How it would have affected my defense is had I been given what the Court ordered, the prior closed cases, prior open cases. Where you really got hurt was when the judge wouldn't let you lead her and ask her questions as a hospital witness. That's where you got hurt. I agree that that area did make my ---- Well, this minutiae might have come out if you had been able to cross-examine her. But she came on as a ---- you got her on as a witness for direct ---- and then the Court limited you to direct examination. I think that the evidence that was probably most important that I didn't get and would have made the most significant difference in the defense is prior to trial, the Court had ordered them to disclose all closed cases she had worked on, all open cases with names redacted, and any and all information of misconduct. Had I had that information, I could have done an investigation to look for a pattern and practice of misconduct. Because the one other case that I learned that she was working on independently of the government, that individual is also claiming entrapment. He was saying she had exchanged sex for drugs and that she had told him she was working for the government and he could work for the government, too. And if he got her drugs, she would get him immigration papers. The problem I have with this case is I don't see where Carrillo has any entrapment defense under any circumstances. It certainly isn't demonstrated in the briefs. I mean, have you any evidence he wasn't predisposed to sell drugs? You haven't said anything about that. That's a part of the entrapment defense. So I don't know what difference it makes what she said to him or he said to her. If he was predisposed to sell drugs, he doesn't have an entrapment defense. Part of the reason why I didn't argue the entrapment in the brief is because the government stipulated before I even opened up my case to the entrapment instruction, that put the burden on them to prove beyond a reasonable doubt that my client wasn't predisposed and that he wasn't induced. So it was the government's burden. Now, the information that did come in with regard to entrapment was the fact that she was a paid government agent. She had a lot of motive to fabricate testimony. And there was inconsistencies in her statement. She knew going in what I was going to be accusing her of. And she said, I've never seen your client in person until after the first deal was done. And when you played the tapes and when you listened to it, it was clear that she'd been meeting with my client before that. And by her just denying that she'd ever seen my client in person before when it was clear from the tapes that she'd had, that suggests that there was some impropriety and she was trying to protect herself from it. So the evidence of the entrapment would have been a lot stronger if I'd had the Brady material and been able to do the research. I'm not sure I read it that way. To me, it looks like my tentative read on it is there was a Brady violation. The government should have given you, without any motions, without anything, exculpatory evidence and evidence tending to show entrapment is exculpatory, and that they should have given you impeachment evidence. And they should have given you the information you needed to subpoena the witness. It was a struggle to get all those things that you were entitled to. It shouldn't have been. But the fact of the matter is you got it all, and you managed to put on in front of the jury a really good case, that this woman seduced the guy and gave him sex and got him all worked up and she'll give him sex if he gives her drugs. And then she got up there and just lied through her teeth, and you proved she was lying through her teeth. And the jury just didn't care. They convicted him anyway. So it looks like there's no prejudice from the violations. Let me address you. You brought up a couple of different issues in there. First, I disagree with you that I got all the information. The fact that I was able to elicit some of this information from the witness on the stand by no means means I got everything. All I got was what she was willing to volunteer. I don't know how much more is out there. And second ---- Are you claiming that part of what the judge looked at in camera contains further information that you should have gotten? Well, there's two points to that. What he looked at in camera, I think I should have still gotten some of that. Did you move or did somebody preserve that so we can look at it and see? Yes, Your Honor. He actually reviewed the information twice in camera. I didn't see an envelope in the file. It was put in under seal, so it might not have been brought up. But it is information that's under seal in the district court, the informant file that the judge looked at. But he had looked at the file two different times. He looked at it a first time, and that's when he made an order disclosing that she worked on four cases, was paid $2,900, and there was nothing else in the file. Even though I'd asked it to be preserved at that time, he gave it back to the government. Then I again asked him, you know, if he had looked at it, and they provided him another file. And it's my contention, although obviously I don't have any proof, that there was obviously different information in the second file, because when the government disclosed the information, she obviously worked on more than four cases. And what the government disclosed was she was paid $6,800. And I can't imagine the judge just missed a chunk of the work. And I think what also happened is in the second time that they submitted it, they brought in some of the stuff from Idaho, which wasn't in the initial file, because the judge didn't have a current address showing she was in Idaho. The judge didn't inform me that she was an active government informant. And, in fact, the judge kept asking the government, is she an active government informant? Is she employed by the government? They kept saying no, no, no. It wasn't until at trial, after the jury was sworn in, that I finally learned she was an active government informant, by the case agent who sat through all of these hearings. So to wait and surprise me at trial with this information was completely, you know, inappropriate. And I think that's where some of the prejudice came in. I shouldn't have had to stand there and work as hard as I did on my feet to get the information in. I should have had it to prepare in advance. And I think that that's where some of the problem comes in with Brady, is the government shouldn't get the benefit of the fact that I was forced to call a witness to bring out the evidence. It looked like you did have to go through a lot that you shouldn't have had to go through. But the fact of the matter is, you did it. And what I'm having trouble with is that under Brady, you have to articulate a reasonable probability that the outcome of the case would have been different had the information been provided in a more timely manner. And that's the precise aspect that I'm having trouble with. Well, Your Honor, I think one thing you've got to keep in mind is the context of the trial. This isn't a slam-dunk case by the government. This isn't overwhelming evidence. The jury came back with a split verdict. They acquitted him of one of the counts, which means they had some serious questions. And keep in mind, they didn't acquit him because they didn't think the sale occurred. Mr. Creel stipulated to every aspect of the case. He said it was him. He said it was crack cocaine, and he said it was more than 50 grams. The only reason that we went to trial was to put on this entrapment defense. And obviously, the jury believed it to some extent. They had questions in their mind, and they acquitted him of the second count. So this is a close case. And when you look at the Brady case law, it says when you've got a close case, any piece of information that might have been minimal in an overwhelming case may be what makes the difference in this case. And I think you need to consider that in the context of it. This isn't an overwhelming case. This is where the jury gave him an acquittal on one of the two counts.  There's a lot. And I list them all in my motion. Kennedy. Well, let me suggest where I'm hung up. There's almost a per se kind of pedophagy by the DEA agent, if not by the U.S. Attorney's Office. I'm not casting any aspersions on the AAUS, but there was pedophagy by this agent. The State was sending you the information. I do not know of any law enforcement agency currently working with this confidential informant. And her last address was in Las Vegas. And he knew that she was in Idaho. Yes, he did. The problem I have, this is a kind of a per se violation. But if it's not per se, then you've got to show prejudice. And where I'm having a little problem is you were kind of hobbled in your investigation by the lateness of finding out even where she was. But then she shows up in court, and then you have to ask direct examination questions, all of which somewhat hobbles your defense. But in the end, most of this entrapment stuff came out. Now, you're not claiming inconsistent verdicts, are you, that she was the jury believed there was entrapment on one count but not on the other? It's sort of a package deal, isn't it? Your Honor, I did allege that in the new trial motion. There is case law that says basically when it's inconsistent, I can't have the benefit of it. But what I was arguing is none of the case law addressed this specific issue because it was two counts of the exact same thing. It wasn't like a conspiracy and an underlying predicate offense, which is a lot of what a lot of the inconsistent verdict cases have. But it's not an issue that I raised on this appeal. It is an issue that was in the new trial motion. On the leading questions, it looked to me, and you give me a reference or something. Help me if I miss something here. It looked to me as though you called her to the witness stand and said, I want to question her as a hostile witness so that I can ask leading questions. And the judge didn't say, no, never. He said, it's premature, not at this time. And because the questions he'd asked her so far, it wasn't apparent that she was a hostile witness. The judge always knows a lot less than the lawyers do about these things. And then it looks like you didn't ask again. So I'm thinking, how can I say that the judge abused his discretion when, so far as he could tell, she wasn't a hostile witness, and you didn't ask again after having difficulty getting things from her? I think I need to address that in a couple of different ways. First, the judge had background on this case. We had several motions hearings. He knew she was an informant. We never know as much as the lawyers. Well, he knew that she was an informant. He had looked at her file. He knew that she had been paid over the course of a year for these cases. He knew I was going to be alleging impropriety on her behalf. And I think part of the problem isn't just that the judge abused his discretion, but as soon as I asked to declare her hostile, the government objected and miscited the case law. They said that I had to show a proving of hostility to get her declared hostile, and that is not the Ninth Circuit case law. It's not a government misconduct issue. It's a judicial error issue. So you've got to show me not just that the government miscited the law, but that the judge abused his discretion. Well, and I think what I can point to, to tell you that, granted, I did not ask again. And I hope you can see how contentious this trial was and the difficulties I was having just getting out the information. That's part of the reason I didn't ask again. But in the new trial motion, when the judge was on the bench, he said, I looked at it again. Never at any point in her testimony did I find her to be a hostile witness. I looked at what hostile means in the Blacks Dictionary, and she always answered your questions. She was never hostile. So I don't think it would have made any difference how many times I had asked to declare her hostile. This judge wasn't going to grant it. And I'd like to move on briefly to the issue of the tapes. The tapes that were admitted were the confidential informant and my client. The government admitted them without any intention of ever calling me informant. And they had argued that they're statements by a party opponent and they're not offered by the truth, for the truth of the matter, what she said. But they never gave a limiting instruction. And thereby, the tapes were hearsay, everything that she had said. And I think that you need to look at how these tapes were used, because I think they're more prejudicial than a person's lance. Because what the government did was they took these tapes, they brought them into evidence by calling their case agent, who merely marked and admitted the tapes. That was their first witness. He called up, he marked and admitted the tapes. He said nothing else. He sat down. Then they called in government agents to play the tapes and explain what the informant meant while the tapes were being played. These are agents who knew nothing about the informant or the tapes other than the sound of her voice. And then their entire closing argument, all they relied on was these tapes, this hearsay evidence. If you look at it, they actually played the tapes back for the jury. They talked about the tapes. And even in their brief to this court, they argued that the tapes were the only evidence of predisposition. So these tapes were central to their case, but they were able to present them while sanitizing the jury from hearing. What they wanted to do was sanitize them from hearing anything about the informant. They wanted to play the tapes and use them against Creo, but never give him his right to call and confront the witness against him. And I think it's important. The tapes isn't a small issue in this, and I'd ask the Court to look at that, because this isn't the only case it's happened in. This is something that's bigger than Mr. Creo's case. And there's no good controlling Ninth Circuit law that applies to this specific issue, because we have no limiting instruction. We have no opportunity to cross-examine. And this isn't a co-conspirator statement. It's not a verbal act. It's not like some of the Seventh Circuit law. I'm confused about the tapes. My thought is that, well, typical cocaine case that I would try as a district judge, they'd always prove it with the tapes. They'd have one on tape by. They'd have another tape by on audio tape. And sometimes they'd have a third one on videotape. And they'd prove it with the tapes. And the AUSA would say, my informant is a really sleazy person. I wouldn't even ask you to believe my informant if it wasn't 100 percent corroborated, blowing away the impeachment of the informant defense. I don't see anything wrong with that. And the reason that the tapes come in, everything the defendant said on the tapes is an admission. It falls within the admissions exception of the hearsay rule. And the other stuff on the tapes isn't introduced for its truth. So it isn't hearsay. But in this case, it is introduced for its truth because the jury's never told that it's not introduced for its truth. The jury's never given any limiting instruction. So it is hearsay in this case because the jury's not told you can't use this for the truth. We're just bringing it in as context. The judge never says that to them. So as far as they know, that information is in for the truth of the matter, and they can use it for that. So I'd like to know. What propositions – let's take a really simple hypothetical tape. Will you sell me a kilo of cocaine for X dollars? Yes, I will. Would you like to buy a kilo of cocaine for X dollars? Yes. We have a deal. There, even without a limiting instruction, the defendant's statements would be admissions, and the other statements would not be introduced for their truth because they're operative. The language is an operative act, offer and acceptance. It's not an empirical statement about facts. Well, in this case, the tapes weren't limited to verbal acts, per se, or just the crime. The entire tape was played. And there's no exception in the Federal Rules of Evidence for – What kind of empirical statements were made in the tapes that a jury would take to be true if it didn't have a limiting instruction? Well, keep in mind the way that the government argued the tape was that this proved predisposition. So they take these isolated conversations, and they start talking about drugs right away, and it looks like he's a drug dealer. It looks like he has predisposition because they don't get the context around the statements. They don't get to know how many times she talked to him before. They don't get to know if she was providing him sex to get him up to that point. They don't get to know anything. So when you take it in this particular situation, you just take these conversations, you're not giving the jury any context. And everything that she's saying, they're using against him because they're looking at the conversation and the back and forth, and they get a chance to judge from that isolated conversation whether there was anything inappropriate going on. So I think in the entrapment case, it's a lot different to come and bring in a tape when I can't explain the circumstances of the tape. Perhaps if it was just a drug deal. And the other thing is they could have easily cured this problem. I'm not saying they can't use the tapes. I'm just saying call the informant so I have a right to cross-examine her. The tapes are fine. Just give me a chance to put them in context and don't call them context when they're not, because that's not what the jury's seeing. The jury's seeing the bits and pieces the government chooses rather than the entire relationship between the individuals. So it looks like I'm just about out of time. I'll try and reserve my 20 seconds for rebuttal. Thank you, counsel. Thank you. It actually means 26 seconds over time. Oh, okay. Counsel? Good morning. May it please the Court. My name is Justin Roberts. I'm an assistant United States attorney from the District of Nevada. There are a number of issues presented to the Court on appeal. I don't intend to address all of them. I would rely on the lengthy brief that was submitted by the appellee unless there are any questions with some of the issues. However, I would like to ---- If I was asking you where somebody was and I had a right to know, you would tell me they were in a big apartment complex in Las Vegas without telling me which apartment so that I'd spend a week of investigative time going from apartment to apartment when you actually knew they were in Idaho, and that's okay. Your Honor, I don't know that the record actually bears that out. What occurred is on February 1st of 2002, pursuant to the Court's order on the eve of trial, the defendant was given the address, last known address of the informant. Correct, Your Honor. In addition, she was given the payment information and the consideration given with respect to the husband. That was all February 1st, 2002. To suggest that the DEA agent ---- I know Judge Goodman has indicated that the DEA agent was engaged in some pedophagy. I don't see that necessarily to be the case inasmuch as she is found. She is ultimately found by the DEA agent. But remember, this is not a truncated thing that happened in a series of days. The address was provided February 1st, 2002. She's ultimately found May 2002, Your Honor. You mean the false and inadequate address? I don't know that there's nothing to suggest that it was a false address. It was the last known address to the DEA agent in Las Vegas on February 1st, 2002. He ultimately finds her in May of 2002, late May of 2002, so that it may appear that the information provided in February 2002 is false, but the evidence doesn't show that. That's not what's in the record. He's able three months later to find her. He doesn't have her on the phone every single day. She wasn't an active informant for him over that three-month period. So it's not false information, I submit respectfully, Your Honor. It's the way these things go in some instances is that he's able three, three-and-a-half months later to find her, because at that point in time she's been reactivated and has contact with the DEA in Idaho, and therefore the DEA in Las Vegas is able to get in touch with her. She was not an active informant, and the record bears that out through her own cross-examination and through the cross-examination of Agent Kosulo that she was not an active informant at the time the information was provided, February of 2002. I believe her cross-examination will say, or she indicated that she had been working in a ministry. The last time she had worked with the DEA was late 2001. And then in that time period, February 2002, she's not working with the DEA. He's under no duty to have day-to-day contact with her. So the information in February 2002, I respectfully suggest, Your Honor, may not have been false. That may have been the best information that was available at that time. But if I can just address some of the items that were brought up. Well, I'd still like to know why the government thought Las Vegas was the last known address of this informant when that was the information given to the defendant. Because that was the information that the DEA in Las Vegas had as of February 2002. There was no indication that they had continuing contact with this individual at that time period. Remember, the transactions that issue in the indictment took place early to mid-2001. There's not a lot of contact after the end of 2001 with this confidential informant. The last known address went to the record to show that DEA in Las Vegas thought she was still in Las Vegas, right? You're just hypothesizing an innocent explanation. Well, I'm responding to respectfully, Your Honor, a hypothetical that it's false information that the DEA. Yeah, I know. But you're not giving us any information in the record that shows that what you're saying is true. What you're saying is a hypothetical possibility. Is that correct? Well, the record reflects that the DEA agent on February 1, 2002, provided via fax, which was then provided to the defendant, the last known address to him at that time. Oh, it doesn't. The record reflects that the DEA provided to the defendant an address of a Las Vegas apartment complex without the identity of the apartment. As for whether it's the last known address or not, whether the DEA thought she was still there or did not know that she had left or did not know that she was in Idaho, I'm asking you, does the record show any of those things? No, Your Honor. What was submitted was the representation that was made, which was the court ordered DEA to provide the last known address. What really gives me such suspicion of honesty is not giving the apartment number. If I told you to deliver some papers to me at my hotel, of course I wouldn't because you're counseled, but say I told somebody that could legitimately do it, deliver some papers to me at my room at my hotel, the desk isn't going to give you my room number probably if you're a stranger. I've been unable to get my wife's room number at a hotel. If I didn't give you my room number, you just wouldn't find it, lest maybe you hired a detective to go knock on all the doors. That would take a real long time. And it seems to me that not giving the apartment number, that raises a flag for me. You're trying to hide something when you don't give the apartment number and you just give the address of a complex. Your Honor, it may very well be that he didn't have the apartment number. I honestly respectfully submit that I don't know what the DEA agent had and did not have that was what was provided. It was the last known address across streets of where he had known her to be at that time in February of 2002. Ultimately, she was contacted three months later. Ultimately, she was brought by the government at trial, and this Court has indicated on a number of occasions when the government is not calling the CI as a witness, it's not under an obligation to bring that witness to trial. She's not in government custody. And that's the issue that came up in the United States v. Cutler from this Court in 1986. Quote, the government was not obliged to make the confidential informant available at trial. But nonetheless, the Court ordered the government in May to bring her to trial, and she was ultimately brought to trial three months later after the last known address was provided. But if I may, by continuing to address some of the issues that were brought up, counsel indicated that government counsel argued below my colleague Mr. Daugherty argued below that the government did not – that impeachment material was not braiding material. That's not, in fact, what was argued. What was argued was that because the government did not intend to call this informant at trial, counsel for the government argued that it was not Giglio material. And in the cases, I would submit that the better practice, and of course would have been to not argue that, to provide that the cases actually are not entirely clear on whether there's a distinction to be made if the government is calling the witness and is not calling the witness. The cases always come before the Court in the context of a witness that the government has called. So the argument below was not a blanket argument that impeachment material is not braiding material. It was that the type of witness, whether the government was calling it or not, it was sort of bled into sort of a jinx act analysis. I want to clarify that point that was brought up by counsel. As we've already been discussing, counsel was asked whether or not she was given information about the agreement the informant had, and she indicated that she got it the eve of trial, which is, again, not the case. It's the time periods that are being truncated. It was February 1st, 2002, when she got it. Indeed, she did, it appears, have to ask for it on a number of occasions, but she got it February 1st, 2002. Trial took place nearly four months later. So the idea that there was some sort of sandbagging or prejudice to her in preparation for the trial is just not there. The information was provided four months in advance. Counsel also indicated that the Court ordered any and all agreements that this informant worked on or any and all cases, any agreements on any and all cases that this informant worked on. Again, that's not the case. The Court asked for the file in camera and indicated in an order that there were some cases ongoing, and because of the nature of the ongoing investigation, the Court deemed it not appropriate to disclose that. There was not a blanket order to provide any and all agreements. I just want to clarify that. The issue of the DEA agent and Judge Goodwin's phrase of pedophagia, I believe I've addressed. And then with respect to the cross-examination of the informant, the case law that was passed in 1982 indicates that defendants are entitled to cross-examine or use leading questions against the government agent, but relevance must be shown first. So that there's not a misciting of the law. Indeed, the case relied upon, and that analysis and appellant relies upon it quite a bit in her brief, is United States v. Bryant, which is the Sixth Circuit case from 1973. And if you look at that case, it actually says that you're not allowed to automatically cross-examine a government informant. It does say if it was a government agent, you can essentially automatically cross-examine a government agent. But if it is an informant, you have to make a showing of hostility first. And here, there was no hostility. It may have been. I thought she was working as an agent, not a mere informant. I thought an informant was just somebody who calls you up with a tip, but she was working as an undercover agent. She made some phone calls on behalf of the government, Your Honor. But in fact the deals on behalf of the government, didn't she? Well, the deals, the hand-to-hand buys were actually done by undercover agents and the employee of the DEA, DEA agents who, with a badge and a gun, fully employed by the DEA. But she set up some of the deals by phone. But my point is that the analysis in the few cases we have on the issue of being able to cross-examine an informant, it appears that it was. If it was just a tipster, no question you'd be right. Just somebody who calls the police and says, I think I know who robbed the bank last week. I think it was my sister's boyfriend. That's just an informant. It may not be a hostile witness at all. No need to cross-examine unless it turns out that way. Well, I don't know that we have a clear answer. But between the C opinion and the Bryant opinion, there is still a relevancy analysis that a court must go through as to whether the questions be relevant. And I would submit that this woman was making a kind of a cottage industry out of rounding up deals that she could turn into cash. She was, what was it, $6,800 that she received at one time that the defendant didn't find out about until much later. She was a very active participant in these deals. And when a defendant is trying to show entrapment, one would think that the best way to get at that information would be to get that informant on the stand, find out what she was doing in these deals, and get the ask her leading questions if necessary. Well, Your Honor, again, I believe there still is a – the trouble is, with respect to leading questions and the analysis in the cases is that – She isn't hostile, but she's about to have her income cut off if all this comes out. That's correct. But with respect to leading questions and the analysis in the cases shows that the defense counsel, to be able to do this, then you have a credibility determination by the jury as to whether or not they believe defense counsel's representations on behalf of her client, for instance, the sex allegation. I mean, it's a lot different question if I might just – if you say, you did have sex with him on X day, didn't you? She says no, as opposed to the more proper question was, did you ever? And – I'm sorry. Maybe that's why she needs to ask leading questions. It's sort of hard to get a person to admit to that unless you can really box them in. Well, she was under oath. She said no. But the problem is, is that if – Did she ever lie under oath? Your Honor, is it – well – People who are – who make a business of seducing men and then getting them to sell drugs would nevertheless be too virtuous to lie under oath? Your Honor, I respectfully suggest that there is nothing in the record to indicate that happened here. This woman was asked on a number of occasions whether sex was remotely involved with respect to the defendant, and she said no. My point is, with respect to the analysis of whether the question can be phrased in a leading manner versus a direct manner, the jury is then left to believe the defendant through her – through his counsel that that happened. I understand that you're treating it for an agent leading questions, for an informant that's unsettled, and that Judge Goodwin's question suggested, gee, if a person is paid to make a business of providing the services to the government that she was providing, shouldn't they fall within the agent category? Well, I would suggest that there first needs to be a foundation, a relevance foundation for it. I mean, you can't just – What do you mean relevance? I don't get it. Well, Your Honor, there was nothing in the record. I believe that one of the orders of the court was that the DEA and the government provide any and all reports indicating that this individual engaged in sexual activities. None were provided. So therefore, it's a – it's a hypothetical circumstance. It may or may not have happened. There was nothing in the record even remotely suggesting it would happen, so that defendant – the suggestion would be that defense counsel can just say, well, you did it for this reason or that reason or that reason, where there's nothing, nothing, no showing. And she would be – the suggestion would be that she needs to make no showing, at least limited showing, that something suggests that that may have occurred, a relevancy showing or – If the DEA agent doesn't ask and the informant doesn't volunteer it, then the defense lawyer is not allowed to ask about it? The defense lawyer was allowed – she was allowed to ask it, Your Honor. But the question I believe I'm answering is whether or not it should have been asked on a – in a leading or a non-leading manner. She was allowed to ask it. And the answer was no. And then it was brought up again several times, and the answer was no. But the problem is, is that if the jury gets to hear, you know, a member of the bar saying that versus the CI, then they're then left to believe that the lawyer – Your Honor, I would suggest that, first of all, no hostility was shown to begin the leading question, and that's what's required at least from the C analysis that we have and the Bryant case. And then with respect to the tapes, counsel indicated that she wasn't able to cross-examine the CI, which is, as we know, is not the case. The tapes were brought in and she was able to cross-examine the confidential informant about those tapes so that that's just not an accurate statement of what happened below. The Court has already – You know, most of your argument has really addressed whether the government did anything wrong here, and we have not focused much on prejudice. Could you use a little bit of your remaining time, argue, assuming even though you don't concede, that the government did wrongfully prevent the defendant from obtaining information in a timely way and obtaining full information, and that the defendant was wrongfully prevented from asking leading questions, nevertheless, there was no prejudice? I realize you don't concede any of those things, and I'm not asking you to, but I want to find out what your answer is on the prejudice issue. Well, Your Honor, first of all, and I don't know if I'm already – my answer is already in your supposition, but the CI was brought forward. She was cross-examined. Agent Kasula was cross-examined. All of these things did come out at trial. A lot of the issues that we're talking about are things that happened prior to trial. The jury got to see all of these things by way of cross-examination and by way of direct examination of the CI. There is no prejudice. Well, if there were violations, no prejudice, and there's plenty of cases from the circuit that, you know, where the circumstances are more egregious in which facially exculpatory information was provided during trial, and this Court had found, and that's the case of Alvarez from the Ninth Circuit here in 1996, that that was not prejudice because at the end of the day it came out at trial, and in this instance it came out before trial even began and it was all presented to the jury. That would be the argument. There were also other – the hand-to-hand buys that were the subject of the indictment, there were other witnesses for that, two agents. And then with respect to the tapes and the entrapment, the tapes, a party admission, 801 D2A, that came in, Mr. Kriller's statement, you know, you take them, unfortunately you take your clients as they come, and he made those statements, and the jury heard from an agent that when you're asked, can you do two for me, and your immediate response is what, green, that indicates, and that was evidence provided by the agent and words out of the mouth of the defendant that he had a predisposition, he had a knowledge of drug dealing. Those things came out and there were no – there's no issue as to the admissibility of the defendant's statement and there was no issue as to the testimony of that DEA agent. Counsel says that this is a close case, and I guess my impression reading the briefs, I didn't really get that impression as to entrapment, but can you – what's your view on that? Well, I – other than what I – the exchange that I just said, my colleague cited in the brief that exchange on the telethon and it came out at trial of the DEA agent that that sort of language suggests that you had that knowledge. Indeed, the court below when looking at the CI file, which should be before Your Honor is under seal, indicated that there was nothing in the CI file that indicated a defense of entrapment, and the court below noted along the way that he did not see anything indicating an entrapment. However, he allowed the argument to go forward. If there are no further questions, I'll submit the remainder of the arguments in the brief. Thank you, counsel. Carrillo or United States v. Carrillo is submitted. And next we'll hear Mulligata v. Regents. Good morning, Your Honor. Testify as static, appearing for appellant Mulligata. Your Honor, the – there are two issues in this case. One is the propriety of dismissal of the plaintiff's discrimination claim as premature. And secondly, whether the plaintiff's claim is premature.
judges: Cudahy, Kleinfeld,jones